**UNITED STATES DISTRICT COURT**            **EASTERN DISTRICT OF TEXAS**

| UNITED STATES OF AMERICA | § | |
|---|---|---|
| | § | |
| *versus* | § | CASE NO. 1:03-CR-17 |
| | § | |
| JOEL DEAN BISHOP | § | |

### MEMORANDUM AND ORDER

Pending before the court is Defendant Joel Dean Bishop's ("Bishop") third *pro se* Motion for Sentence Reduction Under 18 U.S.C. § 35821(c)(1)(A) (Compassionate Release) (#87), wherein he requests the appointment of counsel and that he be released from prison due to his medical condition, which he claims is worsening as he ages. He further contends that his health is now in a state that requires more medical care than the federal medical system makes available to him. On May 19, 2025, the Government filed a response in opposition to Bishop's motion (#90). The Government also submitted correspondence and updated medical records regarding Bishop (#92). After conducting an investigation in April 2025, United States Probation and Pretrial Services ("Probation") prepared a report and recommends denying the motion. The court previously denied Bishop's prior motions to appoint counsel and for compassionate release, which the Government opposed, by Memoranda and Orders dated March 19, 2021 (#79) and March 23, 2023 (#84). Having considered the current motion, Probation's recommendation, the Government's response, the record, and the applicable law, the court is of the opinion that the motion should be denied.

I.    <u>Background</u>

On February 5, 2003, a federal grand jury in the Eastern District of Texas returned a two-count Indictment charging Bishop in Count 1 with Possession of a Firearm Not Registered in

the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. § 5861(d), and in Count 2 with Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1).  Count 1 of the Indictment was dismissed by the Government prior to trial.  After a four-day jury trial, the jury returned a verdict of guilty as to Count 2 of the Indictment.  On October 6, 2003, United States District Judge Ron Clark sentenced Bishop to 300 months' imprisonment to be followed by a 5-year term of supervised release.  The court ordered Bishop's sentence to run concurrently with the term of imprisonment imposed in Docket No. 16654, 411th District Court, Polk County, Texas; however, the court ordered his sentence to run consecutively to his terms of imprisonment in Docket No. 930897, 262nd District Court, Harris County, Texas, and Docket Nos. 476884, 481937, 475110, 475109, 475724, 481940, 476384, 481938, 481939, and 481936, 339th District Court, Harris County, Texas.  The United States Court of Appeals for the Fifth Circuit affirmed his conviction and sentence on direct appeal.  *Bishop v. United States*, 111 F. App'x 343 (5th Cir. 2004).  Bishop subsequently filed a motion to vacate sentence pursuant to 28 U.S.C. § 2255 in 2006, which was denied.  *Bishop v. United States*, No. 1:06cv58 (E.D. Tex. May 24, 2006).  He filed a second motion to vacate sentence pursuant to 28 U.S.C. § 2255 in 2016, which was likewise denied.  *Bishop v. United States*, No. 1:16cv58 (E.D. Tex. Mar. 22, 2018).  Bishop's federal sentence commenced on October 5, 2020.  He is currently housed at Federal Correctional Institution Butner Medium II, part of the Federal Correctional Complex located in Butner, North Carolina ("FCC Butner").  His projected release date is April 15, 2042.

II.    Appointment of Counsel

In his motion, Bishop requests the appointment of counsel to assist him in filing another motion for compassionate release under 18 U.S.C. § 3582(c).  There is no constitutional right to

2

appointed counsel in post-conviction proceedings.  *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) ("The right to appointed counsel extends to the first appeal of right, and no further."); *see Garza v. Idaho*, 586 U.S. 232, 245-46 (2019); *McCleskey v. Zant*, 499 U.S. 467, 494-95 (1991); *United States v. Manso-Zamora*, 991 F.3d 694, 696 (6th Cir. 2021) (finding that "every federal court of appeals to address the issue has agreed that there is no constitutional (or statutory) right to appointed counsel in § 3582(c) proceedings"); *Whitaker v. Collier*, 862 F.3d 490, 501 (5th Cir. 2017); *In re Sepulvado*, 707 F.3d 550, 554 (5th Cir. 2013).  Specifically, the Supreme Court of the United States has stated:

> Our cases establish that the right to appointed counsel extends to the first appeal of right, and no further.  Thus, we have rejected suggestions that we establish a right to counsel on discretionary appeals.  We think that since a defendant has no federal constitutional right to counsel when pursuing a discretionary appeal on direct review of his conviction, *a fortiori*, he has no such right when attacking a conviction that has long since become final upon exhaustion of the appellate process.

*Finley*, 481 U.S. at 555 (internal citations omitted).

The court may, however, in the interest of justice, appoint counsel to assist a defendant in the pursuit of post-conviction relief where a defendant has raised nonfrivolous claims with factually and/or legally complex issues.  *See United States v. Whitebird*, 55 F.3d 1007, 1011 (5th Cir. 1995) ("After [a defendant's first appeal], the decision whether to appoint counsel rests in the discretion of the district court.").

> The exercise of discretion in this area is guided . . . by certain basic principles.  When applying this standard and exercising its discretion in this field, the court should determine both whether the petition presents significant legal issues, and if the appointment of counsel will benefit the petitioner and the court in addressing this claim.

*United States v. Molina-Flores*, No. 3:16-CR-130-N (19), 2018 WL 10050316, at *2 (N.D. Tex. Feb. 13, 2018) (quoting *Jackson v. Coleman*, No. 3:11-cv-1837, 2012 WL 4504485, at *4 (M.D. Pa. Oct. 2, 2012)); *see Scoggins v. MacEachern*, No. 04-10814-PBS, 2010 WL 3169416, at *1 (D. Mass. Aug. 10, 2010) ("In order to obtain appointed counsel, 'an indigent litigant must demonstrate exceptional circumstances in his or her case to justify the appointment of counsel.' The rare cases warranting appointment of counsel in the interests of justice typically involve nonfrivolous claims with factually and/or legally complex issues and a petitioner who is severely hampered in his ability to investigate the facts." (quoting *Cookish v. Cunningham*, 787 F.2d 1, 2 (1st Cir. 1986))).

Bishop is not entitled to the appointment of counsel to assist him with seeking compassionate release under 18 U.S.C. § 3582. *See Finley*, 481 U.S. at 555; *Whitebird*, 55 F.3d at 1010-11 (declining to recognize constitutional or statutory right to assistance of counsel in bringing § 3582(c)(2) motion for sentence reduction); *United States v. Vasquez*, No. CR 2:18-1282-S-1, 2020 WL 3000709, at *3 (S.D. Tex. June 2, 2020) ("There is no right to counsel in § 3582 or other post-appellate criminal proceedings."). Moreover, Bishop provides no basis for the court to conclude that the appointment of counsel would benefit him or the court in addressing his motion. A motion "for compassionate release is not particularly complex factually or legally." *United States v. Drayton*, No. 10-200018, 2020 WL 2572402, at *1 (D. Kan. May 21, 2020); *see United States v. Wilfred*, No. 07-351, 2020 WL 4698993, at *1 (E.D. La. Aug. 13, 2020). In any event, Bishop has failed to raise any potentially viable claims or any factually or legally complex issues that could arguably justify the appointment of post-conviction counsel. Bishop is 70 years old, obtained a General Equivalency Diploma in 1974, was awarded an

Associates Degree in Business Administration at Lee College in May 2000, and has earned 30 hours toward a Bachelor of Science Degree.  Bishop ran his own leather craft business, worked as a service manager for an automobile dealership for several years, and also has skills as a draftsman and electrical designer.  His medical records reflect that although he has some medical problems, he is not terminally or seriously ill, disabled, unable to care for himself, or otherwise a candidate for compassionate release.  While he contends in his motion that he has suffered mental deterioration, that is not apparent from his motion and it is not noted in his medical records.  Probation reports that he is classified as a Care Level 1 inmate regarding his mental health.  In addition, he has twice previously filed a motion for compassionate release *pro se*.  Thus, the court finds that the discretionary appointment of counsel is not warranted.  *See* 18 U.S.C. § 3006A(a)(2) (allowing appointment of counsel under certain circumstances when "the court determines that the interests of justice so require").  Accordingly, Bishop's motion for appointment of counsel is DENIED.

III.     <u>Compassionate Release</u>

    A.     <u>Controlling Law</u>

A judgment of conviction that imposes a sentence of imprisonment is a "'final judgment' and may not be modified by a district court except in limited circumstances." *Dillon v. United States*, 560 U.S. 817, 824 (2010) (quoting 18 U.S.C. § 3582(b)); *see* 18 U.S.C. § 3582(c). Section 3582(c)(1)(A) embodies a rare exception to a conviction's finality.  This statute gives the court discretion, in certain circumstances, to reduce a defendant's term of imprisonment.  The First Step Act of 2018 ("the Act"), Pub. L. No. 115-391, 132 Stat. 5194, in part, amended 18 U.S.C. § 3582(c)(1)(A), which currently provides:

(A) the court, upon motion of the Director of the Bureau of Prisons [("BOP")], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a)[1] to the extent that they are applicable, if it finds that—

(i) extraordinary and compelling reasons warrant such a reduction; or

(ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [BOP] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A). This provision is commonly referred to as "compassionate release." *See, e.g.*, *United States v. Escajeda*, 58 F.4th 184, 186 (5th Cir. 2023) ("We often refer to this as 'compassionate release' because courts generally use it for prisoners with severe medical exigencies or infirmities.").

Rather than define "extraordinary and compelling reasons," Congress elected to delegate its authority to the United States Sentencing Commission ("Commission"). *See* 28 U.S.C.

---

[1] Section 3553(a) directs courts to consider: the nature and circumstances of the offense and the defendant's history and characteristics; the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; the need to deter criminal conduct; the need to protect the public; the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; the kinds of sentences and sentencing ranges established for defendants with similar characteristics under applicable United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") provisions and policy statements; any pertinent policy statement of the United States Sentencing Commission in effect on the date of sentencing; the need to avoid unwarranted disparities among similar defendants; and the need to provide restitution to the victim. 18 U.S.C. § 3553(a).

§ 994(t) (directing the Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples"); *United States v. Jean*, 108 F.4th 275, 278 (5th Cir. 2024), *abrogated on other grounds by United States v. Austin*, 125 F.4th 688, 692 (5th Cir. 2025); *United States v. Jackson*, 27 F.4th 1088, 1090 (5th Cir. 2022); *United States v. Cooper*, 996 F.3d 283, 287 (5th Cir. 2021); *United States v. Shkambi*, 993 F.3d 388, 392 (5th Cir. 2021). Although the Commission issued a policy statement prior to the passage of the Act that described the reasons that qualify as extraordinary and compelling, that policy statement referenced only those motions filed by the Director of the BOP—thus, the Fifth Circuit and other courts held that it was inapplicable to motions filed by defendants on their own behalf. *See Jackson*, 27 F.4th at 1090; *Cooper*, 996 F.3d at 287-88; *Shkambi*, 993 F.3d at 392.

Effective November 1, 2023, the Commission—responding to, among other things, the Act—amended the Guidelines to extend the applicability of the policy statement set forth in U.S.S.G. § 1B1.13 to defendant-filed motions and to broaden the scope of what qualifies as "extraordinary and compelling" reasons potentially warranting compassionate release. *See* U.S.S.G. § 1B1.13. Section 1B1.13(b), as amended, identifies six categories of circumstances that may qualify as "extraordinary and compelling." *Id*. § 1B1.13(b). These categories are: (1) the medical circumstances of the defendant; (2) the age of the defendant; (3) the family circumstances of the defendant; (4) whether the defendant was a victim of abuse while in custody; (5) other reasons similar in gravity to those previously described; and (6) an unusually long sentence. *Id*. § 1B1.13(b)(1)-(6). The Fifth Circuit has clarified, however, that "prisoners have extraordinary and compelling reasons for relief 'only when they face some extraordinarily severe

exigency, not foreseeable at the time of sentencing, and unique to the life of the prisoner.'"

*Austin*, 125 F.4th at 692 (quoting *Escajeda*, 58 F.4th at 186).

As a result, a prisoner seeking compassionate release on his own motion must satisfy the following hurdles:

(1)    the defendant must have exhausted his administrative remedies;

(2)    "extraordinary and compelling reasons" must justify the reduction of his sentence or he must satisfy the requirements of § 3582(c)(1)(A)(ii);

(3)    the reduction must be consistent with the Commission's applicable policy statements; and

(4)    the defendant must convince the court to exercise its discretion to grant the motion after considering the § 3553(a) factors.

*See Jackson*, 27 F.4th at 1089; *Shkambi*, 993 F.3d at 392; *accord United States v. Rollins*, 53 F.4th 353, 358 (5th Cir. 2022); *see Austin*, 125 F.4th at 692.

B.    <u>Exhaustion of Administrative Remedies</u>

Section 3582(c)(1)(A)'s plain language makes it clear that the court may not grant a defendant's motion for compassionate release or sentence reduction unless the defendant has complied with the administrative exhaustion requirement.  18 U.S.C. § 3582(c)(1)(A); *United States v. Garrett*, 15 F.4th 335, 337 (5th Cir. 2021) ("[T]o file a proper motion for compassionate release in the district court, a prisoner must first exhaust the available administrative avenues."); *United States v. Franco*, 973 F.3d 465, 467 (5th Cir. 2020) (holding that the statutory requirement that a defendant file a request with the BOP before filing a motion for compassionate release in federal court "is *not* jurisdictional, but that it *is* mandatory").  The exhaustion requirement applies whether the motion is styled as one for compassionate release or merely for a reduction of sentence under 18 U.S.C. § 3582(c)(1)(A).  Accordingly, before seeking relief from the court, a defendant

must first submit a request to the warden of his facility to move for compassionate release on his behalf and then either exhaust his administrative remedies or wait for the lapse of 30 days after the warden received the request.  18 U.S.C. § 3582(c)(1)(A); *Garrett*, 15 F.4th at 338 ("[A]n inmate has two routes by which he may exhaust his administrative remedies.  Both begin with 'requesting that the [BOP] bring a motion on the defendant's behalf.'" (quoting *Franco*, 973 F.3d at 467)).

Although this requirement is said to be mandatory, the Fifth Circuit has treated it as "a nonjurisdictional claim-processing rule."  *Franco*, 973 F.3d at 468.  "Mandatory but nonjurisdictional procedural filing requirements may be waived."  *United States v. McLean*, Nos. 21-40015, 21-40017, 2022 WL 44618, at *1 (5th Cir. Jan. 5, 2022); *see United States v. Harden*, No. 4:11-CR-127-SDJ, 2025 WL 562716, at *5 (E.D. Tex. Feb. 20, 2025).  Therefore, if the Government fails to "invoke § 3582(c)(1)(A)'s exhaustion requirement as a basis for denying relief," that argument is deemed waived.  *Id.*

A defendant's motion for compassionate release must be based on the same circumstances as those raised in his request for release to the warden of the facility where he is housed.  *United States v. Dodd*, No. 4:13-CR-182-SDJ, 2020 WL 7396527, at *2 (E.D. Tex. Dec. 17, 2020) (stating that "[i]n order to exhaust her administrative remedies, a prisoner must first present to the BOP the same grounds warranting release that the prisoner urges in her motion"); *accord United States v. Thomas*, No. 4:19-CR-28-SDJ, 2023 WL 5279457, at *5 (E.D. Tex. Aug. 16, 2023) (citing *United States v. Mendoza-Garibay*, No. 4:13-CR-00281, 2023 WL 307459, at *1 (E.D. Tex. Jan. 18, 2023)).  Hence, the facts asserted in an inmate's request to the warden and in his motion for compassionate release must be consistent.  *United States v. Scott*, No. CR 17-114,

2024 WL 2187849, at *2 (E.D. La. May 14, 2024); *see United States v. Gonzalez*, 849 F. App'x 116, 117 (5th Cir. 2021). Further, "the exhaustion requirement applies to new arguments or grounds for compassionate release developed after an earlier request for compassionate release." *United States v. Cantu*, No. 7:17-cr-01046-2, 2022 WL 90853, at *1 (S.D. Tex. Jan. 5, 2022) (citing *United States v. Rivas*, 833 F. App'x 556, 558 (5th Cir. 2020)); *accord Mendoza-Garibay*, 2023 WL 307459, at *2.

In his motion filed on June 13, 2024, Bishop asserts that he submitted a request for compassionate release to the warden of the institution where he is incarcerated on May 3, 2024, and that he had not yet received a response. The Government searched for and then requested the pertinent records from BOP counsel. On May 15, 2025, the BOP responded that there is no record of any reduction in sentence ("RIS") request filed by Bishop in 2024. The only records that could be located in response to the request was an RIS packet for Bishop from 2022. On April 24, 2025, Probation advised the court that, on April 15, 2025, Robert Clark, the supervisory attorney for the Consolidated Legal Center of the BOP, stated that Bishop submitted one reduction in sentence request in 2022, but "didn't fully exhaust through the Admin Remedy Program." Thus, it appears that Bishop failed to exhaust his administrative remedies with respect to his pending motion for compassionate release.

Here, the Government invokes § 3582(c)(1)(A)'s exhaustion requirement as a basis for denying relief." Thus, the court is without authority to waive the exhaustion of administrative remedies or the 30-day waiting period. *See Franco*, 973 F.3d at 468 ("Congress has commanded that a 'court *may not* modify a term of imprisonment' if a defendant has not filed a request with the BOP."); *United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020) ("[B]ecause this exhaustion

requirement serves valuable purposes (there is no other way to ensure an orderly processing of applications for early release) and because it is mandatory (there is no exception for some compassionate-release requests over others), we must enforce it."); *United States v. Garcia*, No. CR 2:18-1337, 2020 WL 3000528, at *3 (S.D. Tex. June 2, 2020) ("While the Court sympathizes with Defendant's plight, because he has failed to comply with the exhaustion requirements under § 3582, his motion is not ripe for review, and the Court is without jurisdiction to grant it."); *United States v. Garcia-Mora*, No. CR 18-00290-01, 2020 WL 2404912, at *2 (W.D. La. May 12, 2020) ("Section 3582(c)(1)(A) does not provide [the court] with the equitable authority to excuse [the defendant's] failure to exhaust his administrative remedies or to waive the 30-day waiting period."); *United States v. Collins*, No. CR 04-50170-04, 2020 WL 1929844, at *2 (W.D. La. Apr. 20, 2020); *see also Ross v. Blake*, 578 U.S. 632, 639 (2016) ("[J]udge-made exhaustion doctrines . . . remain amenable to judge-made exceptions," whereas "mandatory exhaustion statutes . . . establish mandatory exhaustion regimes, foreclosing judicial discretion."). Therefore, at this time, the court does not have the authority to grant the relief Bishop requests. In any event, nothing in Bishop's motion or in his medical or mental health records indicates that extraordinary and compelling reasons exist to release him from confinement or reduce his sentence at this time.

## C.    Medical Circumstances

As the basis for his motion, Bishop claims that he is 70 years old and has been suffering from "a very serious medical condition"—namely, that he is a "'very brittle,' insulin dependent, diabetic." He contends that there have been "many changes in the treatment prescribed," adding "the diabetic complications are very many and are getting worse." In his motion, Bishop initially attempted to rely on the provisions of § 3582(c)(1)(A)(ii), but he conceded that he had not served

30 years or more of a sentence imposed under 18 U.S.C. § 3559(c) for the offense for which he is imprisoned. He claimed disingenuously, however, that he has served 25+ years, which is inaccurate. In fact, Bishop's federal sentence did not begin until October 5, 2020. Prior to that date, he was serving a 20-year sentence for aggravated robbery in a Texas state prison.

With respect to a defendant's medical circumstances, § 1B1.13(b)(1)(A), (B), and (C) state that extraordinary and compelling reasons exist if the defendant's motion presents the following circumstances:

> (A)    The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end-of-life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-state organ disease, and advanced dementia.

U.S.S.G. § 1B1.13(b)(1)(A).

> (B)    The defendant is—
>
> > (i)    suffering from a serious physical or medical condition,
> >
> > (ii)   suffering from a serious functional or cognitive impairment, or
> >
> > (iii)  experiencing deteriorating physical or mental health because of the aging process,
> >
> > that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13(b)(1)(B).

> (C)    The defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death.

U.S.S.G. § 1B1.13(b)(1)(C).

12

Bishop does not assert that he is suffering from a terminal illness. While diabetes may be considered a serious medical condition, according to his Presentence Investigation Report ("PSR"), he was diagnosed with the condition in January 2001. After that time, Bishop has been able to engage in a variety of criminal activities both outside and inside prison without any impediment from his diabetic condition. Moreover, although he seems to regard his diabetes as presenting a functional impairment that substantially diminishes his ability to provide self-care within the environment of a correctional facility, the record does not support his assessment of the situation. Bishop also does not demonstrate that his diabetes requires specialized medical care that is not being provided and, without which, he is at risk of serious deterioration of his health or death. To the contrary, his medical records reflect that he is being provided ample medical care by a variety of qualified providers who are consistently responsive to his litany of concerns. He is seen regularly by providers at specialized clinics maintained at the facility, including the Chronic Care Clinic, the Diabetes Management Clinic, the Chronic Pain Management Clinic, and the Substance Abuse Disorder Clinic.

Moreover, while Bishop asserts that his condition has deteriorated over the past 5 years, a review of his medical records discloses that his health has actually improved since he was transferred to FCC Butner from FCC Beaumont in 2021 for uncontrolled diabetes mellitus. Although he complains in his motion about suffering from Bell's Palsy, his medical records disclose that this condition was resolved in 2022 after a course of medication. A Chronic Care Clinic report from Patrick Craft, M.D. ("Dr. Craft"), dated March 10, 2025, notes that Bishop's chief complaint is diabetes. He observes that Bishop has not been in the hospital for the last 12 months and that his blood pressure has been good over the past year. Dr. Craft also describes

13

Bishop's affect as pleasant, cooperative and states that he appears well.  He further comments about Bishop, "Missed CC (community custody) in November 2024.  Hopes compassionate release."

At a clinic encounter performed at the Comprehensive Pharmacy Diabetes Management Clinic on March 27, 2025, L. Hertzog, Pharm. D. ("Dr. Hertzog"), listed Bishop's chief complaints as diabetes, hypertension (high blood pressure), and hyperlipidemia (high cholesterol). He indicates that Bishop stated "he needs glucose and crashed last night and took a snack from the officer."  In response, Dr. Hertzog changed his insulin medication from Levimir to Lantus (28 units AM, 20 units PM), reduced his regular insulin dose to 10 units, and increased his glucose tablets.  He also scheduled Bishop for a pneumonia vaccination.  Dr. Hertzog further writes, "Not carb consistent and self-adjusts regular insulin since afraid of hypoglycemia symptoms"—"[p]atient educated to keep more balanced snacks from commissary" and to "follow dietician recommendations."  Dr. Hertzog indicates that Bishop was given a new glucose monitor (Freestyle Libre 3) the prior day and the resulting data confirm that the monitor is active.  The report further reflects that Bishop is prescribed 25 mg. daily of Losartan for his hypertension and 40 mg. daily of Atorvastin and 83 mg. daily of aspirin for his hyperlipidemia.  He described Bishop's renal function as "stable."  Dr. Hertzog observed that "Patient reported to clinic for call out on time in no apparent distress.  Ambulated into clinic with walker with no observed problems."  He additionally notes that Bishop exercises by "walking around the housing unit . . . using walker."  This document is the most recent report included in Bishop's medical records provided to the court.

14

A report dated February 27, 2025, authored by M. Ha, Pharm. D. ("Dr. Ha"), at the Chronic Pain Management Clinic indicates that Bishop's prior doses of Gabapentin for pain stemming from Type 1 diabetes mellitus with diabetic neuropathy were being reinstated. The entry reflects that the medication had previously been discontinued due to Bishop's illicit drug use. At the visit, Bishop reported pain in his feet and lower legs, claiming that he was unable to sleep all the way through the night. Dr. Ha stated, "I/M observed coming in and out of office using a rolator. I/M did not seem in any apparent acute distress during the interview. Patient admits that he made incorrect choices with drug use and understands why taken of[f] pain medication."

On February 6, 2025, F. Chinea-Perez, Pharm. D. ("Dr. Chinea-Perez") saw Bishop at the Comprehensive Pharmacy Diabetes Management Clinic. Bishop expressed concerns about his blood glucose always being up and down. He also stated that during a shakedown his glucose tablets and medications were taken from him. After noting that some medications had expired and needed renewal, Dr. Chinea-Perez instructed Bishop to go to sick call for the provider to renew his prescriptions. Bishop reported good adherence and voiced no problems with his therapy for hypertension and hyperlipidemia. Dr. Chinea-Perez stated that Bishop had reported to the clinic for call out on time in no apparent distress and had ambulated into the clinic with no observed problems. On December 13, 2024, Dr. Chinea-Perez saw Bishop to provide him a CGM Freestyle Libre 3 glucose monitor. He assessed him as stable on the current dosage of diabetes medications. He added that Bishop had reported to the clinic on time for call out in no apparent distress and that he had ambulated into the clinic with a walker with no observed problems.

Bishop's medical records further reflect that he was diagnosed with COVID-19 on November 26, 2020, and that he had recovered by February 12, 2021, after a period of treatment.

Bishop has been repeatedly tested for the virus since that time as a result of his transfer between prison facilities from Beaumont, Texas, via Oklahoma City, Oklahoma, to Butner, North Carolina, and his leaving the facility for medical treatment, but all such tests have been negative for COVID-19.  There is no suggestion in his medical records that he suffers from "long COVID."

On February 24, 2025, an administrative note reveals that Bishop refused a call out to Optometry.  He also refused to sign a medical refusal form.  Hence, the reason for his refusal is unknown.  Bishop has been diagnosed with keratoconus, an eye condition in which the clear tissue on the front of the eye (the cornea) bulges outward into a cone shape. *See Keratoconus*, TABER'S CYCLOPEDIC MEDICAL DICTIONARY (15th ed. 1985).  According to the Mayo Clinic, the symptoms include blurred vision and sensitivity to light and glare which can be corrected with glasses. *See Keratoconus—Symptoms and Causes*, MAYO CLINIC (June 3, 2025, 4:00 PM), https://www.mayoclinic.org.  There appears to be no medical or logical reason for his refusal. Bishop's refusal of treatment, however, is consistent with his refusal of colon cancer screening on February 16, 2024.  He similarly refused further monitoring of his blood pressure on May 14, 2024, and refused to sign the medical treatment refusal form.  On October 15, 2024, Bishop refused to continue injections of Busprenorphine, a medication used to treat opioid disorders.  On August 13, 2024, he did not show up at the pharmacy diabetes clinic call out.  In fact, Bishop has a record of failing to adhere to treatment and medication orders.  A review of Bishop's Medication Administrative Records for the six-month period November 2024 through April 2025 reveals that he had a total of 321 instances of "No Show" (158) or "Refusal" (163) of medication during that time frame.

Courts of appeal from across the country have rejected motions for compassionate release based on an inmate's medical condition where he has refused or failed to comply with prescribed treatment regimens. *See United States v. Oliver*, No. 21-50170, No. 21-50171, 2022 WL 4285598, at *1 (9th Cir. Sept. 16, 2022) (holding that the prisoner's "failure to adhere to his prescribed treatments undermines his assertion that the BOP's inadequate medical care is an extraordinary and compelling reason for release"); *United States v. Colmenares Fierro*, No. 21-40566, 2022 WL 2357078, at *1 (5th Cir. June 30, 2022) (recognizing that an inmate's declining treatment for latent tuberculosis precluded him from relying on this condition as a basis for compassionate release); *United States v. Broomfield*, No. 20-14514, 2022 WL 896825, at *1 (11th Cir. Mar. 28, 2022) (rejecting motion for compassionate release filed by prisoner who refused to take medications to control his blood pressure or to comply with his doctor's advice to watch his diet and to exercise); *United States v. Glasper*, 854 F. App'x 748, 749-50 (7th Cir. 2021) (denying compassionate release because inmate had refused treatment for diabetes in prison, his asthma was well controlled, and his hypertension was not severe which undercut his assertion that his medical conditions presented an extraordinary and compelling reason for release).

District courts have likewise rejected motions for compassionate release filed by inmates who failed to adhere to medical testing and treatment plans. *See United States v. Waldron*, No. 1:15-cr-41-TC, 2023 WL 258456, at *2 (D. Utah Jan. 18, 2023) (rejecting compassionate release motion filed by prisoner who claimed to have high blood pressure but refused to submit to blood pressure checks); *United States v. Salas*, No. 1:18CR247, 2022 WL 16695265, at *2 (N.D. Ohio Nov. 3, 2022) (denying relief to inmate who did not regularly check his blood sugar as required to manage his chronic conditions, commenting that when a defendant is at fault for the worsening

of his medical conditions he cannot rely on those medical conditions as extraordinary and compelling reasons for compassionate release); *United States v. Patton*, No. 16-40113-01-DDC, 2022 WL 2134197, at *5 (D. Kan. June 14, 2022) (declining to grant relief to prisoner who complained of gastroenterological issues and alleged lack of treatment where he refused an outside medical trip for those issues, remarking that "[i]f Mr. Patton's gastroenterological issue isn't extraordinary enough to warrant a trip for diagnosis, it certainly isn't extraordinary enough to warrant compassionate release from a prison sentence following serious felon[y] offenses"); *United States v. Rodriguez-Sanchez*, No. 8:18-cr-299-VMC-AAS, 2021 WL 3912242, at *2 (M.D. Fla. Sept. 1, 2021) (denying compassionate release to prisoner who was a "no show" for multiple medical appointments for latent tuberculosis); *United States v. Bethel*, No. 3:08-CR-118, 2020 WL 7321372, at *3 (E.D. Tenn. Dec. 11, 2020) (rejecting motion filed by inmate who had failed to complete and refused treatment for latent tuberculosis, stating "this Court will not find grounds for compassionate release created solely by a defendant's refusal to comply with recommended medical care"). As the court reasoned in *United States v. Gonzalez Zambrano* regarding a prisoner who refused to be inoculated with the COVID-19 vaccine:

> Although defendant has a right to refuse medical treatment, the Court finds that it would be inappropriate to reward her refusal to protect herself by granting her release. It would be paradoxical to endorse a system whereby a defendant could manufacture extraordinary and compelling circumstances for compassionate release by unreasonably refusing the health care afforded to them.

No. 18-CR-2002-CJW-MAR, 2021 WL 248592, at *5 (N.D. Iowa Jan. 25, 2021).

With regard to Bishop's claim that he requires assistance caring for himself, his medical and other prison records do not support his assertions. Although he contends that "simple matters such as bathing, and daily functions, are becoming very difficult without assistance," he seems

18

to have no problem arriving at his medical appointments on time while using a walker without assistance, as revealed in all of his clinical encounter records for the prior sixth-month period ending in March 2025. Bishop has been provided various medical equipment to assist in his self-care, including a continuous glucose monitoring device, a glucose meter with test strips, a 4-wheel walker, a knee brace, and medical shoes. He is housed among the general population at the correctional facility in a double cell and is assigned a lower bunk, consistent with a notation on his inmate profile that reads "no ladders/no upper bunk." Bishop is also listed in his profile as a regular duty inmate with no medical restrictions and is cleared for food service. Thus, Bishop's contention that he has become increasingly impaired and unable to function in the prison environment is refuted by the record.

Bishop is classified as a Medical Care Level 3 inmate. According to the BOP's Clinical Practice Guidance, dated May 2019, Care Level 3 inmates "are outpatients who have complex, and usually chronic, medical or mental health conditions and who require frequent clinical contacts to maintain control or stability of their condition, or to prevent hospitalization or complications. They may require assistance with some activities of daily living (ADLs) that can be accomplished by inmate companions. Stabilization of medical or mental health conditions may require periodic hospitalization."

While Bishop's diabetes undoubtedly presents medical care challenges, his condition is exacerbated by his continued use of illicit substances while imprisoned. On January 4, 2024, at approximately 12:15 p.m., Brian Conner ("Conner"), a paramedic, responded to a medical emergency in the inside recreation area. Conner's report states:

> On 1/4/2024 at approximately 12:15 PM, I responded to a medical emergency in inside recreation. Upon arrival, Inmate Bishop, Joel Reg. No. 10456-078 was

19

found unresponsive on the floor. Inmate Bishop was transported to the Health Services Unit for further treatment. While additional medical staff were attending to the inmate, I observed he had a ring-shaped bruise wrapped around upper right bicep and a fresh "track" mark in his right inner elbow as if he had a to[u]rniquet on upper arm and recently injected a substance in his arm. Narcan was administered IN and inmate became more awake and aware of surroundings. Inmate observed for two hours with vitals taken each 15 Min for the first hour and twice after that. Inmate maintained a GCS [Glasgow Coma Scale] of 15 [denoting normal consciousness] the whole time. Inmate has maintained a SPO2 [saturation of peripheral oxygen] of 96-98% the whole time. Inmate talked with Psychology Services. Inmate released to Custody Services.

Conner's assessment was "Suspected Drug Usage/Overdose." At 1:59 p.m. that same day, Patrick Craft, M.D. ("Dr. Craft"), examined Bishop. He observed a fresh needle mark on his right arm, a hair tie around his right bicep, and a syringe in his left sock. Dr. Craft's assessment was "Toxic effect of unspecified substance, undetermined." According to his report, Dr. Craft encouraged Bishop not to use drugs, and Bishop admitted to "being stupid."

At 2:33 p.m. on January 4, 2024, M. Brown, Ph. D. ("Dr. Brown"), assessed Bishop. Dr. Brown observed that according to his PSR, "Bishop reported a history of substance abuse to include the following substances: heroin; alcohol; marijuana; cocaine; crack cocaine; barbiturates; LSD; PCP; methamphetamine; and opiates." Dr. Brown added, "[d]uring today's assessment, Bishop acknowledged recent heroin use" and "reported he has been 'a heroin addict since 11 years old.'" When the doctor inquired whether his overdose was precipitated by suicidal intention, Bishop responded, "Absolutely not. I just took too much (heroin) that I can handle. I'm sorry." Bishop admitted that "he has difficulty managing his substance use urges and cravings."

As to his current mental status, Dr. Brown observed:

Bishop appeared alert and oriented to person, place, time, and circumstance. His grooming and hygiene were adequate, and he was cooperative with the interview process. His speech was clear, coherent, and within normal limits for rate and volume. He made adequate eye contact, and his thought process was goal directed.

20

Throughout the clinical contact, Bishop was euthymic and apologetic (e.g., "That was a stupid thing to do. I'm sorry") and presented with a calm, relaxed affect. His recent and remote memory appeared intact.

Dr. Brown commented that Bishop "appears to have social support in the institution, since he discussed spending time with other inmates on the housing unit as well as interacting with his peer[s] during recreation." Dr. Brown's observations of his appearance and demeanor refute Bishop's allegations in his motion that he suffers from dementia, his brain is impaired, he lacks the mental ability to function, and he is unable to care for himself.

Dr. Brown further noted that Bishop had been assigned a Mental Health Care Level of 1 and had been diagnosed with Opioid Use Disorder, Severe, adding that this remained appropriate at that time. According to the BOP's Clinical Practice Guidance, a Care Level 1-MH classification consists of the following parameters:

No history of psychosis or mania (other than related to substance abuse) AND

No history of hospitalization (other than related to substance abuse) in the last 5 years AND

Requires outpatient contacts with a prescribing clinician no more frequently than every 6 months on a chronic basis to maintain outpatient status AND

Symptoms are controlled on no more than 2 psychotropic medications, excluding atypical antipsychotics.

In a report dated January 4, 2024, at 4:04 p.m., Dr. Brown reported that he had reassessed Bishop's diagnosis due his self-report of intoxicant use, noting that "his recent substance (heroin) use resulted in overdose, which warranted application of Narcan." The doctor added, "Bishop's 'No Diagnosis' is being resolved due to his self-report of current opioid use, persistent cravings, and continued use of the substance despite it causing significant social or interpersonal problems."

Dr. Brown assigned the following diagnosis: "Opioid Use Disorder: Severe, in a controlled environment."

Dr. Brown further remarked that:

Bishop meets substance use disorder for opioid (heroin) use. As noted above, Bishop reported using opiates/heroin within the past 12-month period. During the interview, Bishop frequently expressed his desire to recover from his substance use problems and indicated he wanted to receive substance abuse treatment as he has had difficulties with relapse. He appears to meet criteria for substance use diagnoses consistent with opioid use. His current restricted access to substances while incarcerated has not served as a deterrent for his continued use. Consequently, Bishop required medical intervention for his heroin overdose on 1/4/2024.

Dr. Brown also commented that "Bishop meets criteria for a CARE1-MH care level as he does not show a significant level of functional impairment associated with a mental illness and demonstrates no need for regular mental health interventions. He is currently not prescribed any . . . psychotropic medications." He elaborated that "Bishop is a participant in the MAT [Medication Assisted Treatment] program and has recently started Buprenorphine, as of 2/6/2024. Additionally, he is not reporting any mental health concerns related to psychosis." After the overdose incident, Bishop was placed in disciplinary segregation in the special housing unit ["SHU"].

On January 10, 2024, Marissa Atkinson, Psy. M. ("Ms. Atkinson"), had a follow-up visit with Bishop. She advised that Bishop did not report any mental health concerns at that time. He briefly discussed his long-term goal to "stay clean," and a conversation ensued regarding coping skills and adaptive problems-solving skills. Bishop discussed his hope to "start MAT soon." Ms. Atkinson further noted that Bishop appeared alert and oriented to person, place, time and circumstance, made good eye contact, his hygiene was appropriate, and he was cooperative

throughout the contact.  His speech was clear, coherent, and within normal limits for rate and volume and his through processes were linear and goal directed.  She gave Bishop a Turning Point Module,  to complete while in SHU.  When Ms. Atkinson returned on January 25, 2024, Bishop had completed the Turning Point Module, which consists of "independent bibliotherapy materials that an inmate may elect to complete while in SHU."

On January 31, 2024, Seth Moore, Pharm. D. ("Dr. Moore"), met with Bishop whose chief complaint was "I have to get started on this MAT program or I'm going to die in here." When asked if within the past month, "[H]as drug use led to health, social, or other problems," Bishop responded, "I almost died on the compound the other week."  Bishop further reported engaging in illicit substance abuse "[e]veryday on the compound, but not since coming to SHU." When asked about the frequency of his desire to participate in illicit substance use, Bishop answered, "I get cravings everyday and they are 10/10."  He listed his drug of choice as heroin with an age of onset at 11 years old, explaining that he used IV heroin "all my life."  He added that "[t]he last time I used suboxone [a medication that combines buprenorphine and naloxone] was on Jan 4th," through IV use.  Bishop signed the MAT clinic consent form during that visit and was prescribed naloxone nasal spray and buprenorphine HCl/naloxone sublingual after being advised of their benefits and proper method of use.

On February 1, 2024, Ms. Atkinson interviewed Bishop while in the SHU.  She noted that the staff had not reported any behavioral observations relevant to his mental health.  Bishop denied any mental health concerns but expressed some concerns regarding his blood sugar.  He was encouraged to rest and follow up with his medical provider.  Ms. Atkinson observed that he was working on Turning Point modules and had been provided puzzles.  She reported that Bishop did

"not appear to be experiencing any negative effects related to prolonged confinement." On February 8, 2024, Bishop was started on MAT medications. On February 14, 2024, however, Bishop did not show up for his scheduled call-out for a MAT clinical contact. A drug monitoring report reflects that on September 1, 2024, Bishop tested positive for methamphetamine. There is no indication in the records provided to the court that Bishop suffered any consequences as a result of this finding. As noted above, on October 15, 2024, Bishop refused to continue receiving injections of buprenorphine to treat his opioid use disorder.

Bishop's disciplinary records reflect that he was sanctioned for the January 1, 2024, incident at a disciplinary hearing held on January 17, 2024, at which he was found guilty of possessing drugs/alcohol after he admitted to possessing a syringe. He lost 41 days of good conduct time credit, was placed in disciplinary segregation for 30 days, and lost email privileges for 180 days as a result. About a year later, at a disciplinary hearing held on February 11, 2025, Bishop was again sanctioned for possessing drugs/alcohol on January 7, 2025. The mental health records provided to the court contain no reference to the January 2025 incident. Upon being found guilty based on the greater weight of the evidence, Bishop lost 41 days of good conduct time credit, was placed in disciplinary segregation for 14 days, and lost email privileges for 180 days as a consequence. Hence, it is apparent that Bishop is jeopardizing his health and prolonging his stay in prison due to his actions (using illicit drugs) and inactions (refusing medical treatment and failing to report to medical appointments) while confined. The court also recognizes, however, the need for BOP officials to increase their efforts to limit the availability of illicit substances at the Butner facility.

Bishop's current medical condition does not meet the criteria for compassionate release listed above. None of Bishop's medical problems are terminal, untreatable, or substantially diminish his ability to provide self-care, nor do they otherwise present extraordinary and compelling reasons justifying compassionate release. *See United States v. Thompson*, 984 F.3d 431, 433 (5th Cir. 2021). Bishop is housed in general population, is ambulatory, has no work restrictions, and is cleared for food service. Although he uses a walker to assist him in navigating the facility, there is no indication that he is restricted in performing the activities of daily living or that he is unable to care for himself in the prison setting. In fact, according to Bishop, he is able to inject himself with heroin every day using a tourniquet and syringe, which appears to be one of his activities of daily living.

Probation assesses Bishop's medical situation, as follows:

> In summary, it is believed the BOP is doing their best to address Mr. Bishop's medical issues or concerns and the BOP continues to appropriately screen any inmate they believe should be removed from custody and placed on home confinement. It is also believed BOP case management staff and medical staff are in the best position to consider Mr. Bishop's situation. Furthermore, Mr. Bishop does not present "extraordinary and compelling circumstances," he has not exhausted his administrative remedies, and he does not suffer from a terminal illness; therefore, unless significant changes take place, denial of this and future related motions is recommended.

The court concurs with Probation's assessment of this matter. Thus, as before, Bishop has failed to establish that his medical condition constitutes an extraordinary and compelling reason to reduce his sentence or release him from confinement. As the Fifth Circuit has clarified, "prisoners have extraordinary and compelling reasons for relief 'only when they face some extraordinarily severe exigency, not foreseeable at the time of sentencing, and unique to the life of the prisoner.'" *Austin*, 125 F.4th at 692 (quoting *Escajeda*, 58 F.4th at 186). Bishop does not meet this standard.

D.    Section 3553(a) Factors

The court further finds that compassionate release is not merited in light of the applicable factors set forth in 18 U.S.C. § 3553(a).  *See* 18 U.S.C. § 3582(c)(1)(A) (requiring courts to consider the § 3553(a) factors before granting compassionate release); *United States v. Chavez*, No. 23-50684, 2024 WL 940263, at *1 (5th Cir. Mar. 5, 2024); *Rollins*, 53 F.4th at 358-59; *United States v. Shorter*, 850 F. App'x 327, 328 (5th Cir. 2021) (finding that the court did not abuse its discretion in denying compassionate release after balancing the § 3553(a) factors); *United States v. Keys*, 846 F. App'x 275, 276 (5th Cir. 2021); *Shkambi*, 993 F.3d at 392; *Thompson*, 984 F.3d at 435 n.11 (collecting cases); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020).  Bishop's offense of conviction entails his possession of a firearm by a convicted felon.

On April 23, 2002, police officers in Onalaska, Texas, conducted a traffic stop of the vehicle Bishop was driving.  Bishop gave a false name to the officer.  Upon learning that Bishop's passenger had an outstanding warrant, officers arrested the passenger.  When conducting a search of the vehicle, officers found a tin box filled with an assortment of prescription pills and syringes as well as a 20-gauge, sawed-off shotgun.  Upon discovery of the shotgun, Bishop, who was holding a small dog that had been in the passenger compartment of the vehicle, dropped the dog[2], leaped over the railing of a bridge, ran to a nearby lake, and jumped into the lake.  One of the officers jumped into the lake and apprehended Bishop after a brief struggle.  The officers later identified Bishop and discovered that he had two outstanding warrants from Harris County, Texas, one for a parole violation and the other for an aggravated robbery charge.

---

[2] The dog ventured onto the roadway, was hit by a passing vehicle, and died.

26

Bishop has an extensive criminal history, dating from age 17, which includes prior convictions for robbery by assault (3x), escape, theft (4x), aggravated robbery (11x), unlawful possession of a firearm by a felon, failure to identify, and evading arrest. All of Bishop's aggravated robbery convictions involve the use of a weapon—either a knife or a firearm. His most recent aggravated robbery conviction entailed his pointing a handgun at the cashier in a dry cleaners, demanding that the cashier empty the cash register, and then locking her in a restroom while Bishop fled. Bishop failed to comply with at least 14 previous terms of parole and had his release on parole revoked repeatedly. Further, Bishop was on parole at the time of his offense of conviction. In *Boyd*, the defendant had a similar history of violating probation rather than parole, including committing the offense of conviction while on probation. *United States v. Boyd*, No. 3:17-CR-37-TAV-DCP-4, 2021 WL 5094903, at *3 (E.D. Tenn. Nov. 2, 2021). The court found that "defendant's history of violating probation calls into question his respect for the law and whether he would abide by his conditions of supervised release in this case if his motion for compassionate release were granted." *Id*. This court shares the same concerns in reference to Bishop with regard to his inability to abide by prior terms of parole. In addition, Bishop amassed 39 criminal history points in his PSR, three times the 13 points needed to reach the highest criminal history category. Like the prisoner in *United States v. Jones*, Bishop is "the quintessential career offender." 852 F. App'x 60, 61 (3d Cir. 2021). As the court observed in *Jones*, "even without the career-offender enhancement, Bishop would have a Category VI criminal history—the highest category—because of his long history of criminal behavior since age [17], with most gaps in that behavior occurring only during times of incarceration." *Id*. at 61-62. In

short, Bishop's "criminal history and conduct reflect an unabated propensity for crime." *United States v. Padilla*, No. H-14-174-1, 2021 WL 1517855, at *5 (S.D. Tex. Apr. 16, 2021).

Moreover, Bishop has a long history of poly-substance abuse beginning at age 11, starting with heroin, which he continued to use on a daily basis multiple times per day up to the date of his arrest for his offense of conviction. Indeed, Bishop told Dr. Moore on January 31, 2024, that he engaged in illicit substance abuse "everyday on the compound," his drug of choice was heroin, and that he used IV heroin "all his life." Prior to his incarceration, he also regularly used cocaine, methamphetamine, codeine, barbiturates, Vicodin, Xanax, Soma, and Oxycontin. Therefore, releasing Bishop may facilitate and exacerbate his continued drug abuse, as he would gain unfettered access to a variety of illegal substances outside the BOP.

Furthermore, Bishop's inmate profile dated April 15, 2025, reflects that he is assessed by the BOP as posing a high risk for recidivism and that he has a high security classification. Upon his release from state prison, his community supervision was revoked on multiple occasions due to new criminal conduct. Although Bishop states in his motion that he is no longer a threat to society because he is not the same person he was 25 years ago, Probation disagrees, concluding that Bishop "continues to be a danger to the community due to his criminal history, nature of offense, substance abuse history, loaded firearm involved in the instant offense and assaultive charges and convictions." In light of Bishop's criminal history as well as his continued noncompliance with prison rules and substance abuse, the court agrees with Probation's evaluation that Bishop poses a future danger to the community if released.

In any event, it is unclear whether Bishop would have access to adequate medical and mental health care if he were released, as he requests, to his half-sister, Cinda Harris ("Harris"),

who resides in Nacogdoches, Texas. As detailed above, Bishop has complex health problems that require frequent assessment and treatment by a host of medical and mental health specialists. Harris, however, has no apparent medical training or expertise. Moreover, the variety of medical providers with specialized expertise available in Nacogdoches, a small town located in rural, deep East Texas, would be far less than those available on site or as consultants at FCC Butner, which includes a Federal Medical Center. The Butner complex is located about 15 minutes from Durham, North Carolina, and is close to the other cities (Raleigh and Chapel Hill) that form the Research Triangle area, home to three major research universities. In fact, Bishop references a prior instance in his motion in which he received medical treatment at the Duke University Hospital. The ease of access to medical and mental health care is also greater. Instead of being transported to a provider by his sister after securing an appointment, Bishop need only walk down a corridor of the Butner facility to access medical and mental health care provided in specialized clinics by a variety of physicians and other health care personnel.

In addition, granting Bishop compassionate release would fail to provide just punishment for his offense and promote respect for the law. In *Chambliss*, the Fifth Circuit upheld the denial of compassionate release due to the defendant's not yet having served a sufficient portion of his sentence. 948 F.3d at 694. The district court determined that the defendant's terminal illness "constitut[ed] 'an extraordinary and compelling reason for a sentence reduction' and that he '[did] not present a danger upon release,'" but denied release because "releasing [the defendant] after serving only 14 years of a 30-year sentence minimizes both the impact of [the defendant's] crime and seriousness of the offense." *Id.* at 693-94. "Moreover, the [district] court, citing the § 3553(a) factors, determined that requiring [the defendant] to serve the remainder of his sentence

would 'provide just punishment for the offense' and 'afford adequate deterrence to criminal conduct.'" *Id.*; *see Rollins*, 53 F.4th at 359-60; *Thompson*, 984 F.3d at 434-35 (observing that the courts that have granted compassionate release "largely have done so for defendants who had already served the lion's share of their sentences and presented multiple, severe, health concerns"); *accord United States v. Rodriguez*, 27 F.4th 1097, 1100 (5th Cir. 2022). In the instant case, releasing Bishop after he has served only about 57 months (or approximately 19%) of his 300-month sentence would similarly minimize the impact of his crime and the seriousness of his offense as well as fall far short of providing just punishment and adequate deterrence to criminal conduct.

"Compassionate release is discretionary, not mandatory, and may be refused after weighing the sentencing factors of 18 U.S.C. § 3553(a)." *Chambliss*, 948 F.3d at 693; *see Rollins*, 53 F.4th at 358-60 (upholding the denial of compassionate release of the defendant, who suffered from a "dire" medical situation stemming from a gunshot wound that required the amputation of his right leg and left him paralyzed, and deferring to the district court's balancing of the § 3553(a) factors, including the defendant's "history, the serious nature of his offense, and the danger his release would pose to the community at-large"); *United States v. Gharib*, No. 21-40779, 2022 WL 1565352, at *1 (5th Cir. May 18, 2022). Where, as here, a prisoner has engaged in "severe" criminal conduct and has an extensive criminal history, the district court has discretion to deny compassionate release under the circumstances. *Chambliss*, 948 F.3d at 693-94; *accord Rollins*, 53 F.4th at 358-60; *Gharib*, 2022 WL 1565352, at *1 (refusing to consider the defendant's contention that extraordinary and compelling reasons justified compassionate release due to the defendant's no longer being subject to the career offender enhancement when district court found

30

that the § 3553(a) factors outweighed granting relief); *Keys*, 846 F. App'x at 276 (rejecting Defendant's argument that the court gave too much weight to his criminal history and finding that "a mere disagreement with the court's balancing of the § 3553(a) factors . . . is not a sufficient ground for reversal").

In *United States v. McKinney*, No. 19-00394-03, 2023 WL 2993020, at *1, 3 (W.D. La. Apr. 18, 2023), the court denied relief to a prisoner who had end-stage renal failure and had a portion of his foot amputated despite the Government's concession that the defendant had established an "extraordinary and compelling reason" within the meaning of § 3582(c)(1)(A)(i), finding that "granting compassionate release would not comport with the factors enumerated in Section 3553(a)." The court pointed to McKinney's extensive criminal history that included several drug convictions, firearm convictions, and simple battery. *Id*. at *3. The *McKinney* court noted that the inmate had repeatedly failed to comply with the terms of probation and parole and clearly lacked respect for the law. *Id*. The court concluded that a reduction in sentence would not equate to a "just punishment" under Section 3553(a)(2)(A). The court expounded: "It is this court's belief that a reduced sentence simply would not reflect the seriousness of the offense, would not promote respect of the law, would not afford adequate deterrence to criminal conduct, and would not protect the public from further crimes of this Defendant." *Id*. This court has the same concerns in the case at bar. In view of the nature and circumstances of Bishop's offense of conviction, his extensive criminal history, his repeated failures to comply with prior terms of release, and his history of poly-substance abuse, the court cannot conclude that his early release from prison would afford adequate deterrence or protect the public, as he continues to pose a

danger to other persons and to the community as a whole.  On balance, as in *McKinney*, the § 3553(a) factors do not support Bishop's release.

As the court noted in *United States v. Preston*, "[t]he best predictor of how [Defendant] will behave if he were to be released is how he has behaved when released in the past, and his track record is a poor one."  No. 3:18-CR-307-K, 2020 WL 1819888, at *4 (N.D. Tex. Apr. 11, 2020) (quoting *United States v. Martin*, 447 F. Supp. 3d 399, 403 (D. Md. 2020)).  Here, Bishop's track record is abysmal.  There is no reason to believe that Bishop would not revert to engaging in multiple acts of violence involving the use of firearms and knives along with other criminal activities as well as resuming his daily poly-substance abuse if released from prison at this time.

IV.  Conclusion

In sum, Bishop has failed to satisfy his burden of showing the necessary circumstances to warrant relief under the statutory framework to which the court must adhere.  The 300-month sentence of imprisonment imposed upon Bishop for his offense of conviction comports with the 18 U.S.C. § 3553(a) factors, and he has adduced no extraordinary and compelling reasons to lessen his sentence or release him from prison at this juncture.  Neither his health, his age, nor his mobility challenges merit a reduction of sentence under these circumstances.

In accordance with the foregoing analysis, Bishop's third *pro se pro se* Motion for Sentence Reduction Under 18 U.S.C. § 35821(c)(1)(A) (Compassionate Release) (#87) is DENIED.

Bishop is cautioned to refrain from filing future motions for compassionate release unless he is able to show a significant deterioration in his medical condition, the completion of a substantially greater portion of his sentence, and sufficient documentary evidence of the exhaustion of his administrative remedies.

SIGNED at Beaumont, Texas, this 6th day of June, 2025.

_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE